May it please the Court, Adam Carter with the Employment Law Group on behalf of Craig Waters, who I have the honor to represent. Let me clear up some misunderstanding. I think the District Court missed it. The protected activity in this case is not all in Mr. Waters' mind. I'm going to take the retaliation case first because it's analytically easier. But let me refer the Court to page 606 of the Joint Appendix, and I'll just read for a little bit. Question, at any time while you were employed by LMI, did you complain to Human Resources about age discrimination? I didn't answer. I didn't complain to Human Resources. Did you complain to anybody about age discrimination? I did. To whom? And then it goes on, and he talks about how he went to his supervisor, Lori Becker. And so I did have, I did have fears. And I went to her. She opened the door. I went to her office, and I said, you know, quote, Bob is gone. Is he a gray hair? Am I subject to the same treatment? And I said, quote, you know, I have nine years of college to pay for, and I would like to know, you know, will my position be going forward? That is protected activity every day and twice on Sunday. That is protected activity in this. Why? Because he's opposing the gray hair comment made by Mr. Ford months earlier that everybody was talking about, and he's wondering after the 34-year career of Bob Bertha, is he going to be subjected to the same treatment that he was run out of there? I thought he didn't mention that until he had, until after he had left a meeting discussing his future. No, sir. That's the part that I think the district court missed, and I want to really drill down with Your Honor because this is right here in his sworn deposition testimony. Judge Hilton's opinion then follows from this idea that he never engaged in protected activity, and he did. He clearly did, and it's right here in black and white. And then, that's not just the end of it, then a page later. Wait a minute. Go back. Help me understand what the nexus is to protected activity here. You have this one gentleman who makes a comment about gray hairs, and then your client is concerned that his job may be at risk. What's the discriminatory activity that he's complained of? So, the discriminatory activity is the CEO of the company saying, the future of this company is not with the gray hairs. And, oh, by the way, I've just met with the younger people, and it's so gratifying, and, you know, being That's the kind of innocuous thing that's said in companies all over the country, where people are saying every company, every institution thrives on new blood and fresh ideas and innovation and all the rest. I mean, that's, and he was just, it was almost, when I read it, I thought he was almost making a joke. He was throwing off on himself, because he had some gray hair. Well, that's true, but the problem that your Honor has is that analytically in these kinds of cases, I mean, this is tantamount to the head of an organization saying, the future of this company is not with people of a certain color, of a certain religion. Encouraging, just encouraging up-and-coming young people. No, sir. That's fine. It is fine to encourage up-and-coming people. What's not permitted is to discriminate against those who are older and stereotyping. He didn't discriminate against anybody. He didn't even make a decision. The decision was made by Bridges. It wasn't made by Ford. Let me get to that, your Honor. So this is the connection. So there's this comment out there that everyone's talking about and that was viewed as discriminatory. Then he goes to his boss. He complains about it. Well, he doesn't have to say it's discriminatory. He has to raise it as a concern, which he did. And it's in writing, and it's in sworn testimony, and Judge Hilton missed it. And then, importantly, four days later, the CEO apologizes to the whole company in his email. Now, a reasonable jury can infer from that that the CEO is not happy about having to do the mea culpa and say, I did something wrong here. We have a lot of precedent that just takes it. These comments occur all the time, and they're just so innocuous, really. They're almost throwaways. It's just a way of complimenting younger people who are coming on and saying, look, you're going to live longer, okay? You're the future. The future of the country probably doesn't rest with the gray hairs either. Your Honor, it is no different. The future of the country rests with the next generation and the millennials, and the rest, it doesn't rest with people like us. Your Honor. Is that discriminatory? Your Honor, this is analytically no different, and I'm no fan of the Redskins, but if Dan Snyder said the future of this football organization is not with people of a darker skin, then I think that this would be the exact same thing, and that's what we're having here. He goes to his boss, and he complains. Second point, she does nothing about it. If a sports team wants to engage in a rebuilding process, which is what sports teams do all the time, they announce that they're rebuilding, and that's not discriminatory. If age is a category on rebuilding, then yes, it is. And the same thing is true with respect to race or any other protected category. But here's the point on retaliation. He then goes and apologizes for it. Age is different because we're all going to get old, and you don't want to believe me. Believe me. But, you know, when you're talking about gender or race or ethnicity, those are immutable characteristics, as the Supreme Court has said. But it's a little bit different because all of us are going to be older or elderly one day. So, you know, you sort of, it's odd in this way because you're suppositing that we are discriminating against our future self, which is an odd kind of thing. Your Honor, the point is simple. He goes to his boss and he complains. He then, four days later, the CEO is having to apologize. Then my client on page 608, did you ever complain to Bill Bridges about age discrimination? I mentioned the gray hair comment. Right here in sworn testimony, Judge Hilton missed it, missed it completely. And then they do nothing. They say they have a zero tolerance policy. They did not comply with that. They did not investigate. They did nothing. And then they have this reorganization. Well, Your Honor, they're supposed to investigate complaints. They're supposed to look at them. They're supposed to take them seriously. What is there to investigate? You have the CEO makes this comment. What else is there? What they need to do is to determine is there something afoot in this company that we are going to get rid of people like Bertha and Waters and they considered this guy Miller, who had been there for so long, who they thought overpaid. I thought they kept Mr. Miller. They did keep Mr. Miller, and that's what's important. The difference between Miller. Hold on a minute. Hold on a minute. You're saying that there's this ageism running rampant throughout the company, okay? And Mr. Miller is several years older than Mr. Waters. They're both in the IT area, and the older man, Mr. Miller, is kept on. And the difference between them, Your Honor, is that my client complained. Mr. Miller did not. And so that's the point. That's the salient point that a reasonable jury should be able to consider. Whatever it is, Mr. Bridges, I guess, he's only three years younger than Mr. Waters. That's not irrelevant because of the Supreme Court's decision in O'Connor. What if we do accept your argument that your client established that you established a prima facie case of retaliation? This institute came forth with a reason for doing so. It said quite clearly it's a change in strategy. The old department was led to the firing. What have you put forth to say that's a pretext? I've got eight different arguments that I put out in my papers, and one of them is that the CEO was. My best one is that he is a – they're changing their story is the best one. They said it was a reorganization of one, and then they said, well, it's now once we get into litigation, they say, oh, well, it's his performance. That's not true because he's exceeding expectations for the last 12 years. Wait a minute. I have two responses. First of all, it is a reorganization because they've got a new person coming in, and the duties, they weren't bringing in new people and laying off old people. The duties were being redistributed to existing personnel, and your point about exceeding the performance norms, if you look back at these evaluations going from 1998 to 2014, the problem is that they tell the same story, which is that this individual was simply not suited for supervisory responsibility, that he was very – maybe it's a good thing, but he's very slow and methodical, concentrated on his own task, and in a reorganization, he can't be – he can't be suited for supervising other people and leading a unit because the performance evaluations indicate reservations about the same deficiency year after year after year. Your Honor, a jury would be able to look at those and see that he's rated very, very highly, and with respect to supervision, that doesn't mean anything because they still have a lot of work. Then just bump him down, bump him down from supervisor, offer him a job where he'd still be able to do the work that he does, and keep him on. They were advertising as soon as he's out the door. So that's – But that's in a federal bureaucracy where they can be there all the time and this is a different business. It sounds like you're arguing that in that circumstance, they're supposed to guarantee a job for life. No, sir, that's not my point. My point is that a jury should be able to consider that the one guy who comes forward to complain is the one guy who loses his job in this whole supposed reorganization. There is no reorganization. They rename it, as Your Honor points out. They redistribute the work to younger workers. That's enough for the prima facie case. And back to your question, Your Honor, they have changed their story. And importantly, Mr. Bridges said he relied on a woman named Terry – Did you say they changed their story below? I argued that below. The opposing party says you didn't even bring that up. That's not true. I can point – your court does not have us file the briefs, and I'm happy to tender one, but at page 1421, I'm talking about the changing reasons. I'm talking about you can't trust their decision. I'm talking about how their story has changed. I'm citing Reeves. That's the essence of Reeves. And besides, it's not a refinement of the argument. Well, I agree. And by the way – I'm not saying you didn't raise this argument with any specificity below. And what you did was just quote to me some general boilerplate. Your Honor, first of all, I reject the proposition that I have to argue a specific point about pretext analysis in order to preserve it on appeal. I have to be specific about how exactly they changed all their explanations. And what you just read to me was not at all specific. Your Honor, I talked about the lacking of credibility of decision makers. I talked about that in my brief to Judge Hilton. I talked about the lack of credibility of LMI as a whole. I think that that is the essence of the changing of their story. It's all conclusive. Well, I mean, it's not in the brief below. I cited to it. But let me just move off to the next point with respect to pretext. And this was what I was saying before. Mr. Bridges says that he relied on Mr. Waters' main customer, Terry Bryant, in HR, and that she was somehow unhappy with his work. And the reason why I did my 28-J letter was to point out that with respect to Ms. Bryant, she did this LinkedIn endorsement of Mr. Waters that was glowing. And that's page 309 of the joint appendix. There are other LinkedIn endorsements as well. The co-workers' opinions of a particular point of his being a good Joe just aren't relevant. And the only way it would be relevant is it's not that your particular client is a good programmer, but is he a good supervisor? And the evidence in this case is that Mr. Bertha had really reserved the supervision of everybody to himself and that Mr. Waters was a supervisor, yes, in name. It was because of his pay band that he had to get the title supervisor. He wasn't actually supervising these other people so much as supervising the work. There are performance evaluations year after year saying the guy's got to step up to be a supervisor, and he's not stepping up. I notice I'm out of time. I just want to answer your question. When you read those performance evaluations as a whole, the totality of the circumstances here is that a jury would look at that, see the grades, and see this guy is crushing it. And he's crushing it for 26 years, and they are accepting his work without reservation, and they never put him on notice that you're going to be – No, they didn't accept it without reservation. That was the problem that Judge Agee just pointed out. They expressed reservation. No, sir, that was constructive criticism from a boss who was rating him very highly, who said, you know, if this is an area for improvement, you could do a little bit better on the supervising, knowing that that supervisor who was doing that rating was, in fact, the one who was doing the day-to-day supervising. Thank you, Your Honor. Mr. Bisbee. Thank you, Your Honor. Good morning. May it please the Court, Lincoln Bisbee on behalf of Appalachian Cross Appellant, LMI. The district court appropriately held that no reasonable jury could find that appellant was the victim of either age discrimination   The district court correctly found that appellant failed to make a prima facie case for either age discrimination or retaliation claims. A helpful starting point is the district court's finding that LMI separated the appellant's employment for a legitimate, non-discriminatory, and non-protectual reason. The following facts are not in dispute. First, LMI is a nonprofit corporation where over 65 percent of its employees are over the age of 40, and over 45 percent of its employees are over the age of 50. Second, in May 2013, Laurie Becker became chief financial officer for LMI and engaged an independent IT consulting firm, G2SF, to evaluate the company's IT department. Third, the independent consulting firm's evaluation concluded that LMI's IT department was not operating efficiently. Fourth, based on those findings, Ms. Becker hired William Bridges to evaluate the IT department to determine how its organization could be improved and to ensure that every position in the department was necessary. Fifth, in conducting his department-wide review, Mr. Bridges spoke with appellant's ordinates, spoke with appellant's internal clients. It's an interesting thing because given the pace at which technology is changing, I mean, it's so rapid, and you can be ahead of the curve one day and behind the curve two days later. And what this has done is it's forced companies to change, it's forced companies to innovate, it's forced companies to reorganize and get their IT operations up to date. Exactly the kind of things that we're seeing here. What this all does is it reflects the phenomenal rate of change in informational technology. And if we're going to take a law and say, you know, anytime you want to innovate and effectuate change, you're going to be strung up with an age discrimination lawsuit, that runs the risk of putting us at odds with some very powerful underlying forces, namely the fact that change is proceeding in our society at a faster pace than probably any of us could have anticipated even five years ago. I think that's exactly right, Your Honor, and the facts of this case bear that out. That, for example, Mr. Waters was tasked with helping implement a brand new... What you're speaking to when you say exactly correct bears it out insofar as what? I'm trying to understand. Are you saying that if an industry changes, be it technology, be it the example of a sports team, and there's a basis for getting rid of the old folks there, that the change is sufficient in and of itself and you don't have to worry about age discrimination? What we're saying, Your Honor, is that as abilities change and as technology changes and as systems change, one set of individuals having a greater fluency with that technology is a legitimate non-discriminatory reason. That's where I'm going with it. I mean, I think everybody in here probably feels their children are much more technologically savvy with things than they are. You're in a technical pipe, a company of technology, and you have a bunch of old folks in there. May that company engage in every element of age discrimination and ultimately come to the conclusion, well, we're just changing our strategy, and that's sufficient. So long as the company's decisions are based on a legitimate non-discriminatory reason, they can, Your Honor. But in this case Could it be that younger folk just know more technology? Can they use that as a general basis? I don't think they could conclude that younger folk in general necessarily know more as a class, for example. But if a particular younger employee has more specialized knowledge than a particular older employee, and the decision-maker is making a particularized decision based on that specific knowledge, yes, that would be a legitimate non-discriminatory reason. There's no indication here Mr. Waters was not a good programmer, as I understood, in terms of his skill set. If anything, it went to the leadership aspect of it. Is that the basis for it? That's correct, Your Honor. In large part, the number one concern that Mr. Bridges had, and this is something that Mr. Waters himself admits, is that supervision was not his strong suit and not something he was particularly interested in. Mr. Bridges did notice some other concerns, however. For example, there's undisputed testimony from the head of human resources that Mr. Waters was assisting in implementing a new human resources information service and that he was not as responsive as he could have been, was not as helpful as he could have been. There were other executives in the company, the vice president of finance, for example, that felt that Mr. Waters was not as responsive as he would like him to be, which is not a question of technological aptitude, but just of responsiveness. And Mr. Bridges' personal observations also bore that out. One anecdote in the record is that Mr. Bridges watched Mr. Waters sit at his desk and he had two computer screens, both of which had screen savers running, suggesting he was not performing any work, and Mr. Bridges was troubled when he saw that. And so Mr. Bridges' ultimate decision that once the departmental reorganization had taken place, that there was not an additional spot for Mr. Waters once that supervisor role was eliminated, was based on his conversations with subordinates of Mr. Waters who testified to his supervision, to clients of Mr. Waters who testified to his performance on certain projects like the human resources information services project, and on Mr. Bridges' own personal observations of Mr. Waters. And the law of this circuit is quite clear that what matters in a case like this is solely the decision-maker's mindset, that what the individual who was terminated may think, what co-workers may think, what former supervisors may think, is of no relevance to the inquiry. That if the decision-maker himself had a legitimate, non-discriminatory reason, even one that is wrong or foolish or careless, that alone demonstrates a non-discriminatory, non-pretextual reason for a termination. And the record evidence in this case is undisputed on that point, that appellant's counsel speaks to opinions of co-workers or Mr. Waters' opinions, and those opinions are of no relevance to the underlying claim. They provide no probative insight into whether or not Mr. Bridges, who was the sole decision-maker, and that's also undisputed, acted with retaliatory or discriminatory intent. Importantly, the record reflects both the conversations Mr. Bridges had and his personal observations of Mr. Waters' job performance on a day-to-day basis. Your opposing counsel gives the example that they changed the position, back and forth, in a pretextual sense, and it wasn't consistent. So, as an initial point, we would agree with Judge Wilkinson that that argument has been forfeited. At best, that argument was raised in about two lines of oral argument testimony at the district court, and the Fourth Circuit law is fairly clear that that's insufficient to recess an argument on appeal. That being said, LMI's position has been consistent throughout the case. What appellant's counsel attempts to do is cut up a multipronged explanation into discrete parts and play those parts off of one another. LMI's position has always been that there was a departmental reorganization where there was no longer an applications development supervisor role. So Mr. Waters could not serve in that role because that role ceased to exist. Following that reorganization, Mr. Bridges made a determination as to whether or not Mr. Waters had the aptitude for any additional positions within a significantly reorganized department and concluded that he did not, for all reasons I spoke to a moment ago, the observations he had personally, the conversations he had, et cetera. It's important to note that although Mr. Waters was the only individual who was ultimately let go as part of the reorganization, the reorganization was nonetheless substantial. The entire applications development group ceased to exist, and the entire department was reorganized in a way that made it night and day from the prior organizational structure. And all of that flows from an independent consulting firm's initial recommendations to do the kind of review that Mr. Bridges engaged in. So you have multiple layers of independent, non-discriminatory, and non-retaliatory analysis layering on top of one another, disproving any indicia of pretext for any of the eight, I believe, reasons that appellant's counsel raises in this case. Aside from the issues of pretext, there's simply not a prima facie case in this case. I wanted to address the protected activity briefly. Nowhere in the record does Mr. Waters actually oppose discrimination. The case law is very clear that a retaliation plaintiff, in order to make a prima facie case, needs to raise their concerns in a manner actually opposing unlawful conduct. And there's no oppositional conduct by Mr. Waters in this case. Normally the oppositional conduct is either more vocal or more formal with a formal complaint or a vocal kind of thing that other people remember and the like. You don't have any of that here. That's correct, Your Honor. None of that is here. Certainly an informal complaint would be sufficient, but in those circumstances, someone vocalizes and makes clear that they're actually opposing discrimination. And other people corroborate it, but you don't have the earmarks of oppositional activity that we normally see in these cases. But above and beyond that, the retaliation claim falters for the same reason that the underlying discrimination claim falters, and that is that the motive in both instances didn't have to do with his age or his oppositional activity. It had to do with the completely independent fact that the corporation was simply reorganizing and that he did not fit into the reorganized structure. And that's not retaliation and that's not discrimination. We agree, Your Honor, that there are a number of flaws with Appellant's argument, but the one that cuts across both of his claims is that there is no evidence of pretext, that LMI has presented significant evidence that it acted for legitimate, non-discriminatory reasons, particularly the reorganization. In the structure, you can understand the McDonald framework. We talk of pretext and that presupposes there's going to be a front-of-face occasion and we look to see if there's a pretext reason. Here, in the first instance here, you've got the CEO making this comment. He does come back. I guess he apologizes for it. You kind of realize the sensitivity of what he said. Get up and say, you know, the gray hair is going to be gone. And if you look and you start seeing gray hairs leave, then that would be a problem in most instances. He then, at least the appellant here, at least in responding to Lori Becker, here's kind of a couple of responses. And, you know, one of them, he says something, in fact, Rob is gone. Is he a gray hair? Am I next? That would seem to indicate at least protective activity, at least from a front-of-face perspective. And then once you – even if he does, though, your point, if I understand it correctly, is that pretextual basis is not established for the reason that was given by LMI. That's correct, Your Honor. So LMI's position at the outset is there was no protected activity and that the concern about there being gray hairs who were leaving were akin to the facts in Buck and Hagen v. ICF, which is 650-F-APPX-824, which is a recent decision indicating that stray on-point remarks of age discrimination nonetheless do not create a prima facie case. Even assuming arguendo that there was protected activity, LMI's position is that there is no causation, that the only indicia that the alleged protected activity had something to do with the termination was the temporal proximity between the two events. But here that temporal proximity was 10 weeks. And this Court has held on numerous occasions that 10 weeks' temporal proximity standing alone is not enough to create causation sufficient for a prima facie case of discrimination under the ADEA or retaliation under the ADEA. But you are ultimately correct, Your Honor, that the final position LMI takes with respect to the retaliation claim is even if under McDonnell Douglas a prima facie case of retaliation was established, LMI has set forth a legitimate, non-retaliatory reason for its actions, specifically that the company engaged in a reorganization and then following that, that Mr. Bridges concluded that Mr. Waters lacked the necessary aptitude to fill any additional roles because the supervisor role was eliminated in the reorganized department. The burden then shifts to appellant to demonstrate that Mr. Waters' pardon me, that LMI's explanation was pretextual and we would contend that they have not done so. That the eight reasons they've done primarily fall into a few particular buckets. One, they argue that, well, no one else complained. And that's not true. The record disputes that. That in this case we think no one made formal complaints actually opposing age discrimination. But to the extent that commenting about the gray hairs comment constitutes a complaint, appellant's briefing recognizes that four or five other individuals at LMI raised complaints and those complaints made their way to human resources. So appellant's counsel is sort of in a catch-22 where either there's no protected activity because merely commenting about gray hairs is not opposition to discriminatory conduct, or if that type of general remark does constitute protected activity, there are numerous other individuals who engaged in the exact same protected activity and suffered no adverse action, thus undermining causation. In addition to that argument, appellant suggests that there is no reason for the reduction in force, that there were many years of positive performance evaluations, and that in general Mr. Waters was a strong performer. But that overlooks that none of that evidence and none of those allegations involved Mr. Bridges' decision-making. That the assumptions or the views of coworkers, especially views posted on LinkedIn after a separation of employment has happened, but any view of a coworker or any view of the plaintiff-slash-appellant himself is of no consequence and cannot be used to establish pretext. The only criterion that matters is the thought process of the actual decision-maker, and it is not this Court's job to sit as a, quote, super-personnel department and question the wisdom of that decision. And that's the D-Char-Net case and its progeny running through this year. The final piece that we'd like to raise this morning is, aside from the retaliation claim, Mr. Waters cannot establish a prima facie case of discrimination. There is no evidence that he was performing his job satisfactorily. That, as Judge Wilkinson noted, there are 18 years of performance evaluations suggesting that he was not engaging in a supervisory capacity. In fact, the performance evaluation from his prior supervisor, Mr. Bertha, the year before Mr. Bridges effectuated the termination as part of the reorganization, Mr. Bertha reached the exact same conclusion Mr. Bridges reached, that Mr. Waters should not be functioning in a supervisory capacity. Aside from that, there is no evidence that Mr. Waters was actually replaced by someone outside of his protected class. The mere redistribution of job duties to other employees who were already employed does not constitute the submission or the influence of additional duties and thus does not meet that part of the analysis. But couldn't a company do that in just about every instance when you terminate a person to then split up the responsibilities and send them different places in the sense that they send it to some fellow named McIntyre and all of his employees went under that person there? I mean, why wouldn't that just be a title change as opposed to his position doesn't exist? Respectfully, I think you're right that if that scenario happened and all of an employee's job duties were transferred to another employee, that likely would constitute a replacement. But splitting them, I mean, if his duties still exist, but you just split them up to different places, does that make a difference? Under Fourth Circuit case law, yes, it does. However, that isn't even at play here because Mr. Waters' responsibilities were not all split up. He was the supervisor of the applications development group, and that group ceased to exist. There was no one necessary to supervise that group. If you look at Mr. McIntyre's job description, there is no supervisory bullet point listed there, whereas it was the number one bullet point on Mr. Waters' job description. And Mr. Bridges testified without contradiction that although certain select resources that used to report to Mr. Bridges, pardon me, to Mr. Waters, later reported to Mr. McIntyre, that there was almost no other overlap between those positions. And so in this case, the hypothetical Your Honor raises doesn't even exist. So though I think Fourth Circuit case law would suggest that parceling them out to other people would not constitute replacement, here one need not even go that far because the job duties were not replaced at all because the job duties simply ceased to be as part of the reorganization. I see I'm almost out of time. We would rest on our briefing for the cross-appeal unless the panel has any questions for LMI at this time. Thank you. Thank you. All right, sir. Mr. Carter, let's hear from you in rebuttal. Thank you, sir. Just with respect to what Your Honor asked about waiver before, I will read from my brief below, which is not part of the joint appendix. It's document 32, page 14. Furthermore, Waters was never placed on a PIP nor notified of subpar performance. Bridges testified this was due in part because Bridges had already decided to terminate Waters and such a conversation was not needed. By admitting this, Bridges severely undermines his and LMI's new position that Waters' performance was inadequate. At Waters' termination meeting, Bridges simply notified Waters that his position had been eliminated. I don't know how much more clearly I could argue that they are changing their story. You could have argued it more clearly by saying what the position, what the old position was, what the new position was. I say the old position was that at the termination meeting we are eliminating your position, and then the new position in litigation is that it's performance. Let me go to a few things that my opponent said. The consultant that was hired said nothing about Waters or reorganizes department. Older workers, to Your Honor's point about older workers can get up to date, I think, just as easily as younger workers. Indeed, there is a stereotype out there that kids are all better at computers than people who have a lot of experience on how computers are actually built and how they run. This is a jury question. The whole question about supervision also, this is the key knock on Waters, is that he's not a good supervisor. Well, that's not the point. The point is that he is a good programmer. People are lining up outside his office to get his services, and what we know is that the HR representative who's being relied on by Mr. Bridges as Even if he's a good programmer, what does that have to do with age discrimination or retaliation? It has to do with undermining the reason that is being given, this so-called legitimate business reason. They've got plenty of work for Waters to do. They're advertising for somebody to do the work that Waters was doing as soon as Waters is out the door. So just if he's not a good supervisor, then bump him down in pay, keep him there. They've got the guy they need. There's no reason they have to discriminate against him. And the reason we know that the only difference Why is that discrimination that they've eliminated the supervisor job that he's supposed to hold? Why do they have to keep him as a programmer? They don't keep him as a programmer. They have to keep him as a programmer because they've got the work for him to do, and the only reason that he is being set aside from the herd is that he's the one that has complained. That is retaliation every day of the week. He is the one guy who complains, and to that point about other people complaining, no. There was, in the record, there was the head of HR and then there was the head of communications who said to Ford, your remarks were not good, and people are talking about that. They didn't have any specifics, and in their testimony, they never said anybody came forward. The first person that came forward in this record is Waters coming to Becker, and then Waters coming to Bridges. And this, by the way, is Bridges in mid-October after the email has gone out from the CEO apologizing. Let me just mention the point about screensavers. Your Honor may know you can set your computer to have a screensaver come on in 10 seconds, in 5 seconds, in 30 seconds. How petty is it that this guy is coming by and happens to see a screensaver when somebody has their head down as if to suggest that person is not working? It really is a jury question. It is one other point that I wanted to make, and that had to do with applications development, that the whole department went away. That's not true. They just changed the name. They call it enterprise development. In this day of rebranding, can a company mask their discrimination or retaliation by simply changing the name of the department instead of applications development, call it enterprise development? The work still existed. We've got Bridges testifying that he had people going 100 miles an hour. He didn't want to upset their work. He had to make some decisions. You're trying to run the company and say reorganization wasn't necessary and that Waters was perfectly competent and you didn't need to take the steps that you thought you needed to take, that you could have kept them on as a programmer. I mean, the degree of interference with the day-to-day running of this company on behalf of someone whose longstanding record has highlighted a particular deficiency, a nondiscriminatory deficiency, and for the sake of this we had to get into every aspect of the company's reorganization and management. I mean, it's unbelievable. No, sir, that's not what I'm asking. It struck me as it was. Well, and if I may, Your Honor, say a jury should sit there and listen to the evidence and listen to the evidence that this one employee, after 26 years of fine performance, look at his ratings, look at the objective standards, look at how he was rated. Yes, he got some constructive criticism. We all do. Adam, you could write a little better. Adam, you could blue book your briefs a little better. Those are all things that I've gotten in my reviews. Let me just say a jury can say one guy, one guy loses his job, and he's the guy that complained. Right, and people older than that did not lose their job, who were in the same thing. You say, oh, that's because they didn't engage in oppositional activity. But I'll tell you, you know, I've seen a lot of these cases, and oppositional activity is invariably etched in a much more clear-cut way than it is here. Your evidence of oppositional activity is after the fact. No. And it is weak. It's unopposed. It's not unopposed. Well, it is in terms of the evidence. Okay. Your Honor, just to finish that point, he swears to tell the truth, he says he complained, and Bridges and Becker don't remember it. That's the state of the record. Thank you. Thank you. We'll come down and greet counsel and take a brief recess.
judges: J. Harvie Wilkinson III, G. Steven Agee, James A. Wynn Jr.